And here, our next case, number 251408, Metaldyne Powertrain Components v. Sansera Engineering. Mr. Donovan, you are ready. Good morning, Your Honors. Thank you for having me and my client. I'm here for the appellant, Metaldyne. My name is Bert Donovan. It's lovely to be in the red courtroom. I must admit I was intrigued by the tweed courtroom, so it might be a little more warm and inviting. This one is much better. This one is absolutely gorgeous, and I appreciate this. So I wanted to focus the Court's attention, knowing how thoroughly you analyzed the submissions, on the nature of this case, because it really is a mistake that needs to be corrected. This is a cost of recall and field actions case. And the recall and the global field service actions related to the case were necessary to eliminate an unreasonable risk of vehicle safety. In this case, a blocked rear wheel on a motorcycle that could cause a crash. And what happened is, if you were to have a fracture of a pin, you would have the ability to have two gears engage at once, lock the rear wheel, and have a loss of control. The risk of the pin fracture is what we hear about, because the risk is what a recall addresses, not the actual fracture itself, because if you did that, it would be too late. So why would you have a field action? It's mandated by a federal statutory and regulatory scheme, and it starts backwards from the risk to the end user, the operator. If there's an unreasonable risk of motor vehicle safety, the mandate in the Code of Federal Regulations, the regulatory scheme that follows the Safety Act, requires the manufacturer and the equipment manufacturer and everybody in the supply chain to comply with the recall obligation. It's mandatory. You saw some words that essentially said that Metaldyne caved to BMW. Protecting the safety of end users, not only is it appropriate, it's necessary and it's mandated by statute. So when you are implementing a recall, what you're doing is risk avoidance, not property damage. Again, if you're addressing property damage, damaged transmissions, damaged pins, you would be too late because you wouldn't eliminate the risk. And the risks that we're talking about exist in a population of suspect motorcycles. And the reason it's a population is that when you have what we have here, which is the failure to make parts consistently using heat tempering that would make the parts resistant to fracture, so they're tough enough not to fracture when used, if you don't do that properly and you do it randomly or erratically, which the record is replete with that, what you create is a population in which some parts are okay and some parts are subject to fracture. So you need to get that population, the suspect population, and take all of the parts that are at risk and replace them. But they're not broken. They're not damaged. But they have a risk associated with them because of a manufacturing issue. The manufacturing issue relates to the parts of the contract under which we've sued. And that contract allows for warranties, a variety of warranties, expressed and implied. And the expressed warranties, the promise in Section 8.1, is that the parts will meet the specifications, performance criteria, and they won't have any material issues, and they will be fit for their purpose, which means a motorcycle fork, which is intended to assist and ensure the shifting of gears works as a motorcycle fork, a transmission fork. And the pin within that failing was the material issue. The material issue relates to the failure to meet the warranty with respect to the appropriate manufacturer of the goods by failing to follow your own rules with regard to heat tempering, which provides the resistance to fracture, which makes these safe. And the bottom line here is if they made what they intended to make using the processes and machinery and temperatures and times and quenching that they promised to do, you don't have a problem. It's only when they deviated from that that you have a problem. And that's what BMW told the federal government in this recall report. And so right from the jump, BMW. Can I ask you a question? Yes, sure. So as I read your colleagues' brief, they were really focused on the scope of the settlement with BMW in this case and what exactly was released. Can you explain to me basically what the scope of the settlement is? Does it only cover recall costs? Or does it release claims, all claims related to this, not a motorcycle person, but to this transmission, like even if it were a property damage claim or a personal injury claim? BMW didn't make any property damage claim, but there is a broad release that covers a variety. Can you speak up a little bit? I can't hear you. I'm sorry. I'm a little farther than the microphone. I apologize for that. The answer was BMW did not make any of those types of claims, but their release is broad. But the focus isn't on what the release says. It's on what you paid for. And if you look at JA 747, which is a settlement agreement, and then JA 751, which is Exhibit A, what you have there is line item detail. And what your line item detail is, that's where we can establish. Sorry, can you repeat that? I'm having the same issue with volume. Could you repeat the citation you just gave? Yes. It's JA 747, and I'm speaking as the Exhibit JA 751, which has the line item detail. Thank you. I just wanted to confirm. No, sorry about that. And the line item detail we're talking about all relates to addressing the risk associated with a fractured pin by only paying for the corrective actions in the population. Again, we're not talking about broken pins in the population. And how do you do that? Well, you have to buy three good forks with pins, and then you have to put them in the transmission, because there's three of these in each transmission. So that's one part of what we paid for, and that's right in there. And then you have to install it, so there's labor costs. That's the second part. But in order to do all of this, you have administrative costs. You have to mail people notices of their problem and tell them to take it in to the dealer. And you also, when you create a supply chain for replacement parts, you have to ship those parts and store those parts, and there's processing charges. So that whole line item detail, that's why you have such a precise figure with regard to what we've asked for. So the bottom line here is when you understand the nature of a recall, you realize that a recall can't address after-the-fact property damages, because if it did, it'd be too late. It wouldn't be doing what the statute and the regulations require, which is eliminate the risk. So the recall was preventative, not repair to damaged parts or transmissions. Can I ask you a question? If I'm assuming just hypothetically that you are right, that Section 9 doesn't apply in this case, then what happens when the case goes back on remand? Sure. Well, on our complaint, we would have the four causes of action, in addition to the indemnity causes of action, which would be the breach contract, which would cover our warranty rights, and the remedy obligations associated with those. Those would be 8.1, 8.3, which are specific to recall, and 14. But on the recall, if I look at it, if I read 8.3, and even under, I think, Section 14, the recall is referring to the recall, BMW recall. You would agree that you all did not conduct any recall? No, because you can't conduct a recall as the component part manufacturer, because you need to do the repairs at the vehicle and transmission level. And that's what is anticipated by the federal scheme. So how would 8.3 apply? Because this is 8.3 seems to discuss in the, it actually defines recall and the liability and damages in the recall if you all did not conduct a recall. Your Honor, if you look at JA 281, which I think you're reading it. One more time. I couldn't hear you. I'm sorry. If you look at JA 281 and what you're reading in the second line of that, it talks about voluntary or government-mandated offered by buyer or the vehicle manufacturer to remedy an alleged defect that affects motor vehicle safety. And that is defined as a recall. And that's, why does it say it's just like that? Because this is a contract that was written in a vehicle supply chain where you have the component, the pin placed into an assembly, the fork placed into another assembly, the transmission placed into the vehicle, which is a motorcycle. And if you want to make sure you're covering yourself, you would want to make sure that the recall provision actually references the folks that have the ability and the regulatory obligation and statutory obligation to conduct the recall. So 8.3 gives you a right. 8.1 gives you a right. And 14 gives you a remedy, a non-exclusive remedy. Right. Because 14 also says, like, you have anything you would otherwise have under this contract or any other source of law. Here's some more things you also have. Exactly. And we point to it in our papers for the fact that property damages and recall are separate. But, Your Honor, what you point out also points out that we can pursue this under the UCC 2315, which is the But your claim is for indemnification. In this, if I read section 14, it reads as if it is for direct damages. And I think what the district court seemed to be struggling with is under section 14, she gave you an opportunity to go back and amend your complaint regarding your damages. Because this reads as if it's direct damages. It says incurred by the buyer conducting a recall campaign, which I think we all can agree that your company was not conducting a recall campaign. This is an indemnification claim. It is also a breach of contract claim, a breach of warranty claim, both expressed and implied. And the obligations for compensation appear both in the contract, including, we believe, 14, also in the UCC, because these are consequential and incidental damages. You can't fix what you needed to fix to eliminate the risk without doing these things. So we have multiple paths to this. I'm sorry, go ahead. The district court did give you an opportunity to go back and supplement damages. I think that's the struggle that the district court was having is that the only damages that you have sought are damages related to the indemnification. So there are no additional damages that have been alleged other than the, and I think, I want to say, I think your experts can see that the sole source of the damages is just the settlement payment, right? But the settlement payment was for the activities of correcting the defect associated with the manufacturing issue that created the at-risk population. And where the judge got it wrong was Section 9, which is actually not preclusive. It's very narrow. It doesn't apply here. It only applies. It says product liability right at the top. And it's after you have this opportunity to do recall separately and warranty separately. And it says injury, death, or property damage. And where the judge got hung up was on property damage. Because that was the misapprehension. That's why I started with what a recall does. If a recall only associated itself with property damage, it wouldn't be effective because you would have already visited the risk upon the public. You need to arrest the risk before it manifests itself before property damage occurs. So this is why I was asking sort of what would be left for the district court. If we agreed with you that Section 9 doesn't apply, I would think it would be up to the district court to figure out whether Section 14 applies, whether Section 8.3 applies. Like that's all the district court said was that 9 applies and you lose under 9. But they said it was exclusive to the district court. She said it was. The judge said it was. I think what Judge Benjamin is pointing out is the district court then issues some other orders that dismiss other claims. But would your view then be. . . All infected by the district court's initial mistake that Section 9 applies in the first place?  And the property damage assumption, which is inaccurate. It did infect everything. And what it did is it took you an eraser. Because, Judge Harris, what you were pointing out is. . . Just to be serious. You would be actually combining Paragraph 8.1, Paragraph 8.3, Paragraph 14, the UCC implied warranty and the UCC remedies provisions plural and the implied warranties plural in order to give you multiple paths to the same goal, which is to recover the costs associated with buying new forks that aren't subject to fracture, finding the forks that are subject to fracture and replacing them and taking care of an at-risk population, some of which includes problematic forks and some of which doesn't. That's just the very nature of recall. But even if we send it back to the district court on Section 8.3, you still have the same issue that you had under Section 9 because it says that you are supposed to negotiate it on a case-by-case basis. It's supposed to be a good faith allocation of responsibility for the recall and that the costs and damages incurred and other relevant factors. None of that occurred here. The opportunity to do so was precluded in two major ways. One is, if you recall back in 2018 when this first came in, the day, I think it was the 18th, or it was August, maybe the 12th, we said, hey, what's going on here? They sent a guy out to the plant that was doing the heat treating, and that evening he found out things were very, very bad, and he sat on it and they buried it. He didn't sit on it with his bosses. His bosses sat on it with us. So at that moment, two years before the recall, they knew what was causing the deviation in field performance. It was a lack of controls regarding manufacturing. And then there's a lot made in their papers regarding what happened waiting two years later in 2020. Well, it wasn't waiting two years. They were aware as we were aware. And then as soon as they found out about that, what did they say? There is no evidence that this is a problem. They say that this is a stray. And I would draw your attention to JA 229 to 232. Having gone on site and found issues related to a defect that is exactly related to the BMW description in the 573 and then saying unequivocally we have nothing and this is a quote, unquote stray, misleads us. You can't be part of this continuum of negotiations when you started out with a false premise upon which everybody relies. Thank you. Counsel, you're a little bit over, but you have time on rebuttal. Unless, did you have more questions? Thank you. Good morning, y'all. And may it please the Court. I'm Kevin Hall, representing the appellee here. I'm joined by Levi Wright here. I'll introduce you to him. He is a brand-newly minted University of South Carolina law grad, and this is his first week on the job. So he's here for the fun. Let me begin by saying Section 14 and Section 9 operate in tandem, not in competition with each other. They are, have distinct roles that are defined by the contract, and really what the delineation is is whether you've got a first-party claim or a third-party claim. If you examine Section 9 and, by comparison, Section 14, you'll notice that Section 14 talks about warranties between the buyer and the seller, that is between Metaldine and Sancerra. It's all in the context of warranties. Well, warranties are always between the parties to the contract, not third parties. Nowhere in Section 14 is the word third-party used. Nowhere is indemnification used. It envisions exclusively. Okay, but it seems to me that you're setting up a false dichotomy, which is that this case must be governed by either 14 or 9, and I'm not sure why that's necessarily true. My bigger problem is I don't understand why 9 applies here. 9 applies here because the, this is a third-party claim. Sure, but it doesn't say all third-party claims. It says third-party claims. This strikes me as just the absolutely critical language that, with respect, I'm not sure the district court ever grappled with. For bodily injury, death, or property damage. Right. I don't understand how any of these claims are for bodily injury, death, or property damage. Property damage occurs when you have a component part of a larger product that damages the larger product. How does it damage? Sorry, it damages the larger product in the sense that it makes the larger product not work? Well, it makes it not work or it is. Sorry, like when I said, like, I totally would get four property damage if, like, let's say this was a component of a toaster. Right. And the component exploded inside the toaster and damaged the rest of the toaster. That, I guess, I can conceptualize as a claim for property damage. Right. But that's not what happened here, right? It is what happens here. Well, in fact, they say over and over and over again that not one penny of the money that was paid to BMW was for situations where a motorcycle exploded. Well, look. And you never, you don't agree with that? But I've read your brief extremely carefully. At no point in the brief, they assert it over and over and over again, not one red cent of this payment was for an exploded motorcycle. And nowhere in your brief do you say that's not true. Well, that's a lot to unpack. But is that factually true, that nowhere in your brief do you ever once deny that not one cent of this was for an exploded motorcycle? Your Honor, I don't. Because I'll follow up by asking you on what page in your brief do you say that if you claim that you do? Your Honor, I get the question. Here's the point. So the answer to my question is no. Well, they paid for. No, no. Sorry. I asked a very simple question. In your brief, do you ever once take issue with the claim that not one cent that was paid to BMW was for an exploded motorcycle? Your Honor, I think that the. . . This is a really easy yes or no question. Your Honor, we don't talk about exploded motorcycles. Great. We talk about what they bought. Okay. I'll take that as a no. Your toaster example, this is akin to your toaster example. The allegation is that a shift fork pin is too brittle and it breaks. And when it breaks. . . No, the analogy to mine is that someone realizes there's something in the toaster that might make the toaster dangerous or not work. So as a preemptive matter, before any toaster explodes, we're going to go replace all the toasters. That's the analogy to my hypo. Well, here BMW had field events where toasters did explode, where motorcycles did explode. But that's not what BMW was paid back for. Well, they were paid. . . BMW released Metal Don for any claims that could come out of those, including bodily injury. Now, they want to tell you that the release is. . . Oh, well, it says we got a release from everything, but we didn't really pay for something else. They got a complete release of all third-party liability. Okay. Let me try this a different way. What's your best claim for the proposition that what we're talking about here is a claim for property damage? When you put. . . No, case. What decision of what court should I read for the. . . Because I will say, as a textual matter, this just does not seem to me like a claim for property damage. And so if you have authority of some court that says and explains. . . Because, again, with respect to the district court, the district court's opinion literally just asserts this. It never explains why this is a claim for property damage. So I'd like if you know of a case that explains why this is properly understood as a claim for property damage. What case is that? Penn National and Thruway. Okay. Penn National and Thruway stand for the proposition that when you put. . . Remind me again what court decided that case. I'm going to rely on my colleague. Let me look at my copy here. These are an Eastern District of North Carolina case, which is Penn National and Thruway is a Western District of New York. So what it definitely is not is a decision of the Supreme Court of the relevant state or a decision of this court. That's right. Okay. Again, they stand for the proposition that when you have a component part. . . The Penn National case is bad chicken blend went into dog food. Okay. And so what does that mean? Is that property damage? And the court says, yeah, when you damage another party's property, that is property damage. So it's bad chicken what? Bad chicken blend went into dog food, damaging the dog food. Okay. That sounds right. That seems different, and that seems intuitively correct, just as a matter of common sense, like the dog food was bad. Like if I stir a rotten onion into a mixture, it's going to make the whole mixture bad. So that seems intuitive how that may be a stamp. When you put a bad pitch, a bad shift fork assembly into a transmission, you do the same thing. You destroy the transmission. Okay. Can I ask you another question? Sure. We've talked about property damage, but I also don't understand. . . I mean, this is a product liability provision. That's what it's for. That's the title. The whole last part of it is about the seller obtaining product liability insurance, and this certainly isn't a product liability claim, right? Well, look, the heading says product liability, but the distinction is who is seeking recovery. Right. And for a product liability claim, it has to be the end user, and we don't have any claims here by end users. So what's going on? You have any end user complaint, any end user case is going to come up through BMW to Metal Dine to Sancero. It's a third-party claim. Just as a practice, can I take this on the tort law? Sure. Like let's say a motorcycle had counterfactually exploded, and let's say someone injured by the exploded motorcycle wanted to sue people. It's been a while since I've taken torts, but my sense is they could sue BMW. Obviously, BMW sold them the bad—well, they could sue the dealer that sold them the bad motorcycle. Then they could sue BMW. But they could also sue Metal Dine and Sancero, right, like under tort law. Everyone who—like the fact that they can sue BMW doesn't mean they could have only sued BMW. They could sue all of these people under— Now, as a practical matter, BMW is a gigantic multinational corporation that essentially has bottomless pockets, so you'll probably just sue BMW. But you could sue the part manufacturer under tort law, right? Well, look, you could certainly sue Metal Dine, whether that comes all the way up to any privity with Sancero is another question. But the point is if Metal Dine settles those claims with BMW or with that injured rider— And then Metal Dine brings a third-party claim against it. It's like the only reason that our thing was bad was because you gave us a thing that was bad that made our thing bad. So any liability we have to the customer now flows to you. That's how it would work. And that's Section 9. Well, I mean, that's also tort law 101. Right. It's Section 9, and that's what we have here. We don't have—let me give you an example of how 9 and 14 complement each other. So where is the product liability claim in this case? The product liability claim here is what they bought with a release. They bought releases from those product claims. But they bought it from BMW? Yes. But BMW can't bring a product liability claim. I'm just confused. When BMW gets sued for a product liability claim and they try to come upstream, Metal Dine is off the hook. Metal Dine paid for that release. You mean if BMW gets sued? Because based on the evidence in the record, BMW was never actually sued by any customer injured by an exploding motorcycle. But that's why I was asking, where is the product liability claim here? Well, look, they haven't sued as of yet. I mean, that doesn't mean they can or they won't, and it doesn't mean those claims weren't settled and we don't know about them. The point is they're downstream claims. If I might, let me walk through a factual scenario that I think demonstrates the interplay. Let's say that Metal Dine is receiving shipments of shift forks. They say, hey, we notice we've got a problem here. We think some of these aren't hard enough. We think we've got a brittleness issue. They inspect. They shut down the line. They inspect. They check it all out. That's 14A, right? That's breach of warranty, a claim under Section 14A. The stuff you gave us doesn't have the characteristics the stuff you gave us is supposed to have. Right. And so we've got to inspect, sort, we've got to figure it out, and we've got to put our line down to figure it all out. So we've lost production time. That's 14A and 14B. These are direct implications between the two, right? Let's say at the same time they've got that downtime, Metal Dine says, look, to Judge Benjamin's question, we better conduct a recall ourselves, all right? We better call BMW and send some folks out to their plant to make sure that the transmissions that are there have good pitch forks or shift forks in them, and we'll pull them back and we'll do some work. That is 14C. That's conducting recall campaigns and taking other corrective actions. Again, it's breach of warranty. Let's say that when they come back and they're doing the testing to verify and figure out what's going on with these transmissions, one of those shift fork pins breaks, tears up the transmission, tears up the testing equipment, cuts through the wall, which is what happens when these engines explode, and sprays hot grease oil on some body and further damages equipment. That's 14D. That's personal injury and property damage, again, between who? The first parties, the parties to the contract. Now, let's assume BMW launches its own recall. BMW launches its own recall and says, hey, we've got riders out there in the field. We've got to have a recall, which, and again, here, remember, it was BMW, not Metaldine that did the recall. Any of the recall costs that BMW incurs and passes upstream, that third-party recall expense, that is a Section 9 expense. It's not a breach of warranty between Metaldine and Sinsera. It's a third-party indemnity claim. What is, say again, what was the beginning of that sentence? I'm sorry? Can you just say that sentence again? What is it that is a third-party indemnity claim? BMW's attempt to recover the cost of its recall is a third-party claim. It is a third-party claim. They are not a party to the contract. No warranty has been breached to BMW. They are seeking recovery, not because of a breach of warranty between the parties to the contract, but they are seeking recovery downstream. Okay, so I agree with you 100 percent it's a third-party claim. Right. The question for me is whether it's for property damage. I won't. I have assistants who help me. Both of the two cases you cited to me, in addition to being non-controlling, involve contracts that defined what property damage means. Do you have – there is no definition of what property damage means in this contract, right? Well, they define property damage. I think if I were to – Do you disagree with the proposition that both of the two cases that you cited to me a few minutes ago involve contracts that defined the words property damage? I understand them to define the word property damage is by referencing something else. The courts in those cases, as I read them, says, look, property damage is a damage to a tangible item, a tangible good. Then they have other exclusions and say, for the purposes of this contract, we're going to take this out of the definition of property damage. That's a definition. Right. But fundamentally, what something – whether something is property damage or not. It's just not clear to me how much a non-controlling case from out of a jurisdiction that involves a contract that defines the term in question tells me much about how to define this term in this contract. Well, Your Honor, I don't see cases that say on the other side, you know, analogously I think it's clear when you damage a third party's property with your good, that's property damage. That just logically makes sense. It makes sense in the dog food concept. Well, but it starts to – it also – I mean, let's say this was a statute, not a contract. It starts to violate all kinds of rules of construction that would apply if this was a statute. I know it's a contract. But, like, it's not just the words property damage. It's – it's, as Judge Harris pointed out, it's in a provision that's captioned product liability. And then it says for bodily injury, death, or property damage. I think we can all agree that the first of those two – the first two of those three terms sound like a motorcycle exploded and hurt an actual person. And so then that would – I think this is a Euston Generous I can never remember – would suggest that we should on balance construe property damage as things of the same nature as bodily injury or death. And we put a bad part in, and as a result it doesn't work so well, doesn't seem super analogous to person – to death or bodily injury. Your Honor, you heard the entire argument that you received from my colleague was how dangerous this is, how much of a risk this is to the traveling public. Yeah, but if it said risk of bodily – yes, it may well have created risk of bodily injury. It may well have created risk of death. But claims for risk of bodily injury and risk of death are not the same as claims for bodily injury and death. And they got a release for bodily injury and death, Your Honor. That's what they bought. Now, they would like to say, oh, well, look, we paid for what the release says, but that's not really what we bought. You heard it said. We paid for something less than what the release says. That simply can't be true. Did you understand the district court to adopt that reasoning that there's something about the scope of the release here that was animating the district court's decision? I thought the district court just thought, look, recall costs come under nine, the property damage. Your Honor, we went back and forth with this a couple times, as you all know, in two rounds of briefing with the district court. The district court focused on an analytical sequence that goes like this. Who is making the claim and against whom are they making it? Because whether it's a first-party claim or a third-party claim really determines whether it goes to Section 14 or Section 9. Well, the claimant here is a third-party. Okay? The first sentence of Section 9 says, Celestron indemnified Mettledine against third-party claims against buyer Mettledine or its customers BMW. Okay? How is BMW the customer? When I read BMW buys. No, I'm sorry. I'm sorry. I didn't mean it in the literal sense. Legally speaking, it's a product liability provision. So I read this like the customers are the end users, the people who can bring a product liability claim. It says against buyer Mettledine or its customers. Mettledine doesn't sell any product to motorcycle riders.  That's why I'm wondering why this thing applies at all. The buyer is BMW. The customer is not an end user. The buyer is BMW. That's the whole point. Okay. Again, let me try to drill down on this. Look. No, no, I'm fine. Section 14 is exclusively between Mettledine and Sinsera. The warranty is between them. Section 9 says when you get past those two, that's a third party. And that's third-party claims asserted against buyer Mettledine or its customer. Who's its customer? Its only customer is BMW. Right. And that's how you read the provision. I'm suggesting the fact that there is a product liability provision that runs against a buyer or its customers. In most contexts, what we're going to be talking about is the end user customer. I agree with you. There's no such person in this case. Your Honor, respectfully, that is absolutely precluded by the language of Section 9. I saw a light bulb, I thought, going on when I said customer. Oh, my goodness. Well, I'm sorry the light bulb turned out to be a mirage, but maybe we should probably just move on. Okay. Let me ask you this, because counsel on the other side is making this argument regarding 8.1 and 8.3 being the more, is where I guess we are in terms of where this claim lies. And I'm curious to hear your argument as to, I guess, 8.3 or 8.1. You've already discussed 14. I think his argument is 8.1, 8.3, and 14 kind of all work together to give him his damages on the indemnification here. Well, the question, I think, is, you know, Section 8 talks about the warranties, right? The things that can happen. But the question is, how do they recover them? And 14 and 9 determine what pathway you have to go to recover them. Now, look, if they were engaging, they said, look, since you breached your warranties to us, we're talking to you about those warranties to us that you breached, and they had a settlement between the two of them, that would be under Section 14. What Section 9 does is guarantees that if Mettledine goes somewhere else and tries to write a check on Sincera's account, doesn't include them in the discussion, doesn't give them a chance to participate in the settlement discussions, and goes and writes a check without their consent, that they're forced to be in the loop at the same time. And they're complementary in that way. Otherwise, you have them out running, writing checks on somebody else's account without that participation here of Sincera. That's why we say the reading that they're offering you guts Section 9. It guts Section 9. It lets them recast every breach of contract, excuse me, every indemnity claim as a breach of contract or breach of warranty claim. That's what they're doing here. And by saying, well, this is breach of contract, this is breach of warranty, this is not indemnity, they gut Section 9. It allows them, if they're reading holds, that they can go settle cases out there, and they don't have to get any consent or give notice of those claims. So, again, in terms of contract rules of construction, if we're supposed to give effect to all provisions, how can that be? How can Section 14 be read to gut Section 9? And we cite cases that speak to that. When you're seeking the same damages in indemnity and in breach of warranty and in breach of contract, it's the indemnity claim that survives. You can't recast those as breach of warranty or breach of contract to circumvent the notice and consent provisions. Thank you. Thank you. I'll keep my comments very brief. I wanted to start by making sure that I adequately addressed Judge Benjamin's question earlier. I was short on time, and I'm concerned that I may not have fully articulated my response. It would be helpful to you. So with regard to Section 9, if we want to have that discussion, just we know it only applies if this is a property damage claim, and we don't agree with that. But even if it was, it shouldn't erase, in our view, Section 8.1, 8.3, and Section 14, which also work in concert. I agree with counsel that to the extent Section 9 applies to anything, it would work in concert with 14. But so does 8.1, 8.3, and Section 14. And remember when I started here, one thing I was careful to point out is that this is a cost of recall case and a recall response to a safety risk. Warranty, on the other hand, is often focused on the performance of a product against specific measuring sticks, and that's what we have here in 8.1. But the fact is, while not necessarily so, a breach of warranty could be the cause of a safety risk in a recall, and that's what happened here. The safety risk that manifested itself was as a result of the breach of warranty with regard to manufacturing. His argument is that the breach of warranty is between Metaldine and Sincere under 14 and not BMW, which is who conducted the recall campaign. Again, we don't agree with it that way. It was just explained in our briefing. But also, Section 14 is not exclusive. It's not exhaustive. Those are a list of things in addition to anything else you get, which is contained, one, under 8.1 and 8.3, and also under the UCC, the implied warranty is fitness for purpose. When parts are fit for their purpose because they're consistently manufactured, they don't have a tendency to fracture and cause the wheel lockup is our point of view. And we think there are multiple paths, which is why we had six counts in our complaint, to these types of recoveries. In my 35 years of doing this, it's typical in the experience to have those multiple theories and paths because they are in parallel. And where we really take exception here is to the exclusivity argument in that Section 9.1, we just don't think it's a property damage case. And, two, it's not an exclusive provision. It doesn't erase the other provisions and rights. But you would agree that 9 is the section that really talks about indemnification, and that is what we have here. Respectfully, Your Honor, I don't agree with that. I agree that it says the word indemnity, but the right to get paid for things that we paid to others is very clearly allowed. And what's interesting is the criticism seems to be from the other side, is that the fact that you have a very specific contract tuned to the supply chain that gives you recall recovery rights associated with a recall that your customer has is insufficient. It's a straight line to the damages we're seeking right in the language of the contract. And they want to take an inapplicable paragraph and erase the specific. And with regard to the other part of your question, Your Honor, you indicated, you know, weren't they precluded from participating in the negotiations? They excused themselves from doing so in two ways. One, as soon as they found out in 2018 they had a manufacturing issue, which incidentally was turned off because they pulled that supplier right away, so the risk was frozen at that point with regard to that manufacturing issue. They hid it. And we didn't find out until just after, I was right at the end of 2024, 5 a.m. depositions. I remember hearing this and going, that's what happened. That's what they did. They buried it. And the problem is the judge didn't have that because, in our view inexplicably, during the year that this was under consideration, the first motion for summary judgment, we couldn't take depositions. So the consent being either gotten, pursued, or unreasonably withheld was never vetted. So that was premature. And then fast forward a couple of years, which they say is too long, but that's when the additional accidents that manifested this risk occurred. And what did they do? They doubled down on the inaccuracy. At JA-229 and JA-230, they say, we would like to conclude that this is a stray case of failure and since Sarah is not responsible for whatsoever cost implication due to this failure. They wrote that two years after they had a guy on the ground in a plant saying, we've got to get out of here. There's a problem. They're not doing anything they agreed to and they're using the wrong equipment. They shouldn't benefit from that misleading. Not only does it preclude an actual negotiation and consent, it also set everybody on a course that could have been easily avoided because exactly what BMW said happened, was proven to have happened in 2018. But they were excluded from the negotiations, the settlement negotiations. They excluded themselves. They refused to negotiate. They refused to discuss. They gave us flat denials. And during the denials, they used language that they knew was inaccurate because they'd already concluded and confirmed that they weren't making these parts properly at their supplier. And then, to be honest with you, it's all over the briefs in this court. They shouldn't be saying to anybody that they didn't know the parts were being made improperly because they found out about it in 2018. Thank you. All right. We're going to come down.  I agree, counsel. And then we'll hear our third and final case. Thank you very much. Thank you.
judges: Pamela A. Harris, Toby J. Heytens, DeAndrea Gist Benjamin